UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STEVEN W. PRITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-02664-JPH-MPB |
| | ) | |
| CORRECT CARE SOLUTIONS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

Plaintiff Steven Pritt, an Indiana inmate currently confined at the New Castle Correctional Facility ("New Castle"), was transferred from New Castle to the Marion County Jail several times between December of 2015 and February of 2017. He brings this action pursuant to 42 U.S.C. § 1983 alleging that he received inadequate medical care for his heart condition and mental health issues while he was confined at the Jail. He has sued Correct Care Solutions ("CCS"), the private contractor that provides medical services at the Jail; several individual medical providers; and a social worker. The defendants move for summary judgment on these claims and Mr. Pritt has responded. The defendants replied and Mr. Pritt filed a surreply.[1] For the following reasons, the defendants' motion for summary judgment is **granted in part and denied in part**. The motion is **granted** as to Ms. Andrews, Nurse Clemons, and Nurse Poland; the motion is **denied** as to Nurse

---

[1] Local Rule 56(d) allows a surreply when the movant cites new evidence or objects to the admissibility of evidence in the response. The defendants move to strike to Mr. Pritt's surreply arguing that it was filed too late and does not merely address the objections to the evidence presented in his response brief. As discussed below, the surreply has been considered, but makes no difference as to the outcome. Accordingly, the motion to strike, dkt. [120], will be **DENIED**.

Carter, Nurse Clark, Nurse Hansen, Nurse Kannaple, Nurse Roberts, Nurse Wheatcraft-Hadley, and CCS.

## I. Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II. Statement of Material Facts

The following statement of facts is evaluated pursuant to the standard set forth above. That is, these facts are not necessarily objectively true, but are viewed in the light most favorable to Mr. Pritt as the non-moving party. The statement of facts is based on Mr. Pritt's medical records, the defendants' testimony, and Mr. Pritt's sworn testimony. To the extent that the defendants object to some of Mr. Pritt's testimony, the Court has considered only the testimony that is based on his personal knowledge and that describes his symptoms as he experienced them. Factual disagreements about disputed events have been noted.

In addition, the defendants argue that Mr. Pritt's version of the facts should not be considered when his version conflicts with his medical records. In support, the defendants reference the Supreme Court's holding in *Scott v. Harris* that, when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 550 U.S. 372, 380 (2007). In *Scott,* the disputed factual issue was whether a motorist fleeing law enforcement officials was driving in way that endangered human life. *Id.* The non-moving party's version of events was discredited by a videotape that recorded the incident. *Id.* at 378. Unlike a videotape, Mr. Pritt's medical records do not constitute an indisputable objective record of his medical treatment. Indeed, the accuracy of the medical records is one of the central disputed issues as Mr. Pritt argues that "[s]ome [medical providers] documented his complaints and some did not." Dkt. 114-1 at 3. Therefore, the medical records are not entitled to any more weight than Mr. Pritt's testimony.

### A. The Defendants

Defendants Robin Wheatcraft-Hadley, Laura Poland, Brian Carter, Tracy Roberts, Lauren Kannaple, Debra Clemons, and Heather Michelle Clark (now Hernandez) are Licensed Practical Nurses ("LPNs") who were employed with CCS. Dkt. 96-2 at 1 (¶¶ 1-2)*;* dkt. 96-3 at 1 (¶¶ 1-2); dkt. 96-4 at 1 (¶¶ 1-2); dkt 96-5 at 1 (¶¶ 1-2)*;* dkt. 96-6 at 1 (¶¶ 1-2). Defendant Pamela Hansen was employed as a Registered Nurse for CCS during the relevant times. Dkt. 96-7 at 1 (¶¶ 1-2)*.* These nurses were not authorized to diagnose patients, create a treatment plan for patients, determine the course of a patient's treatment, or order medical treatment or medication. Dkt. 96-2 at 1 (¶¶ 1-2)*;* dkt. 96-3 at 1 (¶¶ 1-2); dkt. 96-4 at 1 (¶¶ 1-2); dkt 96-5 at 1 (¶¶ 1-2)*;* dkt. 96-6 at 1 (¶¶ 1-2); dkt. 96-7 at 1 (¶¶ 1-2)*.* They were authorized to triage and assess patients, take vital

signs, and communicate the patient's condition to the medical provider (physician or nurse practitioner), if necessary, and provide treatment pursuant to a providers' orders. Dkt. 96-2 at 1-2 (¶ 2)*;* dkt. 96-3 at 1-2 (¶ 2); dkt. 96-4 at 1-2 (¶ 2); dkt 96-5 at 1-2 (¶ 2)*;* dkt. 96-6 at 1-2 (¶ 2); dkt. 96-7 at 1-2 (¶ 2)*.*

Defendant Megan Andrews is a licensed social worker and the Mental Health Coordinator at the Jail. Dkt. 96-1 at 1-2 (¶ 3). As the Mental Health Coordinator, Ms. Andrews oversees the entire Mental Health Department at the Marion County Jail. *Id.* The Mental Health Department at the Marion County Jail consists of a psychiatrist, a nurse practitioner, and multiple masters-level clinicians and mental health providers. *Id.* Ms. Andrews would assess and meet with patients, depending on the staffing at the Jail. *Id.* Ms. Andrews is not a medical provider. *Id.* at 2 (¶ 4). She cannot prescribe medications, diagnose patients' medical needs, or order treatment for patients' medical needs, including dispensing medication. *Id.* If an inmate raises a medical concern with her or she notices a physical injury or medical concern, Ms. Andrews will advise the medical staff so they can address that issue. *Id.*

**B. Mr. Pritt's Time at the Marion County Jail from December 14-17, 2015**

**1. December 14**

On December 14, 2015, Mr. Pritt transferred from New Castle to the Jail. Dkt. 96-1 at 8. The prison sent one page of a two-page Medication Administration Record with Mr. Pritt, showing that he had active prescriptions for Aspirin; Coreg (Carvedilol – a beta blocker used to treat heart conditions); Colace (Docusate – a stool softener); Monoket (isosorbide mononitrate – used to treat symptoms of coronary artery disease); and Zoloft (Sertraline – used for anxiety and depression). *Id.* at 9. Mr. Pritt also brought his medications from New Castle with him. Dkt. 114 at 5 (¶ 2).

5

Nurse Clemons conducted his intake screening. Dkt. 96-1 at 10-15. At the end of this screening, Nurse Clemons referred Mr. Pritt to the medical provider for chronic care and to mental health staff for routine mental health problems. *Id*. at 14. Nurse Clemons would not let Mr. Pritt keep his medications and told him that CCS policy prohibited inmates from having their medications. Dkt. 114 at 5 (¶ 2). Nurse Clemons noted that Mr. Pritt requested to go into segregation for self-protection and she conducted a Pre-Segregation Health Assessment and cleared him for segregation. Dkt. 96-1 at 16-18. Nurse Clemons obtained orders from Dr. William Spanenberg and he prescribed Aspirin, Coreg, Colace, and Monoket, the same medication Mr. Pritt took at New Castle. *Id.* at 22. Dr. Spanenberg also prescribed Nitroglycerin as needed, Zocor, and Flomax. *Id*. Nurse Clemons obtained orders from the mental health nurse practitioner, who prescribed Zoloft, which was the only mental health medication Mr. Pritt reported taking. *Id.* at 21. Mr. Pritt did not receive his Zoloft or Monoket that day. Dkt. 114 at 5 (¶ 3).

### 2. December 15

On December 15, 2015, Dr. Kellee Blanchard, the psychologist at the Jail, met with Mr. Pritt for his Initial Mental Health Evaluation. Dkt. 96-1 at 17-18.

During the 9:00 a.m. medication pass, Nurse Jennifer Eidson administered the following medication to Mr. Pritt: Colce, Coreg, Aspirin, and Flomax. *Id.* at 27-29.

During the 9:00 p.m. medication pass, the records reflect that Nurse Carter administered the following medication to Mr. Pritt: Colace, Coreg, Zoloft, and Zocor. *Id.* Mr. Pritt asserts that he did not receive Zoloft that day and that he asked Nurse Carter for this medication. Dkt. 114 at 6 (¶ 4).

### 3. December 16

On December 16, 2015, Dr. Gabra Gachaw, the psychiatrist, discontinued the nurse practitioner's short-term order for Zoloft and instead prescribed Zoloft for 90 days. Dkt. 96-1 at 26.

During the 9:00 a.m. medication pass, Nurse Poland administered the following medication to Mr. Pritt: Colace, Coreg, aspirin, and Flomax. *Id.* at 26-29. Nurse Poland did not administer Monoket at that time because it was not in stock. Dkt. 96-3 at 2 (¶ 3). Any time that Nurse Poland was passing medication and she discovered that a medication was not in stock, she followed up with her supervisor to confirm that the medication was being ordered from the pharmacy. *Id.* Nurse Poland testifies that she would have done that in this case. *Id.*

During this medication pass, Mr. Pritt did not have an active order for Zoloft. *Id.* (¶ 4). It appears that on that day, Dr. Gachaw's new long-term order for Zoloft had not yet made it into the system when Nurse Poland did her medication pass. *Id.* Nurse Poland administered all medications for which Mr. Pritt had an active order. *Id.* Nurse Poland had no other involvement with Mr. Pritt during December 2015. *Id.* (¶ 3).

During the 9:00 p.m. medication pass, Nurse Wheatcraft-Hadley administered the following medications to Mr. Pritt: Colace, 100 mg capsule, Coreg, 6.25 mg tablet, and Zocor, 20 mg tablet. Dkt. 96-1 at 27-29. Mr. Pritt told Nurse Wheatcraft-Hadley that the was having chest pains, difficulty breathing, nausea, and pain and he asked her for Nitroglycerin. Dkt. 114 at 7 (¶ 5). She did not request urgent care for him or otherwise treat him. *Id.* Nurse Wheatcraft-Hadley had no other involvement in Mr. Pritt's medical care during December 2015. Dkt. 96-2 at 2 (¶ 3).

### 4. December 17

On December 17, 2015, during the 9:00 a.m. medication pass, Nurse Kannaple documented that Mr. Pritt refused the following medication: Colace, Coreg, Aspirin, Flomax, Monoket, and Zoloft. Dkt. 96-1 at 27-29. Mr. Pritt states that he asked Nurse Kannaple why he was still not receiving Zoloft. Dkt. 114 at 7 (¶ 6). He also states that he never refused or denied care. *Id.* (¶ 7).

During the 9:00 p.m. medication pass, Nurse Brian Carter administered the following medication to Mr. Pritt: Colace, Coreg, and Zocor. Dkt. 96-1 at 27-29. Mr. Pritt returned to New Castle on December 17, 2015. *See* dkt. 96-5 at 2 (¶ 4).

Nurses Clark, Hansen, and Roberts and Ms. Andrews had no personal involvement with Mr. Pritt during December 2015. Dkt. 96-1 at 3 (¶ 9). dkt. 96-4 at 2 (¶ 3); dkt. 96-6 at 2 (¶ 3); dkt. 96-7 at 2 (¶ 3).

### C. Mr. Pritt's Time at the Marion County Jail between July 13-22, 2016

Mr. Pritt returned to the Jail on July 13, 2016. Dkt. 96-1 at 3 (¶ 10).

### 1. July 13

Nurse Hansen conducted Mr. Pritt's intake screening. Dkt. 96-7 at 2 (¶ 4). During that intake screening, Mr. Pritt reported taking medications, including a blood pressure medication, aspirin, Flomax, and Zoloft. *Id.*; dkt. 114 at 8 (¶ 2). Mr. Pritt brought his medications with him and told Nurse Hansen that he had done so, but she could not find them. Dkt. 114 at 8 (¶ 2). Mr. Pritt did not have any paperwork showing the medications he was taking. Dkt. 96-7 at 2 (¶ 4).

Nurse Hansen's usual practice when an inmate claimed to need a medication but did not have supporting documents was to schedule the inmate to be seen in the Jail's chronic care clinic, so that the doctor or nurse practitioner could decide if the inmate needed medication. *Id.* Nurse Hansen believes that she would have done that on this occasion. *Id.* Mr. Pritt would not have had

his chronic care clinic appointment within that time frame because he was only in the Jail for another week. *Id.*

Mr. Pritt claims that without his medications, he suffered blurred vision, ringing in the ears, chest pain, difficulty urinating, confusion, and headaches, among other symptoms. Dkt. 114 at 4 (¶ 14). Nurse Hansen referred Mr. Pritt to the mental health staff due to his reported mental health issues and because he reported taking medication that she could not verify. *Id.* Mr. Pritt's vital signs were normal when Nurse Hansen took them during Mr. Pritt's intake. *Id.*

### 2. July 15

On July 15, 2016, Nurse Roberts completed a Pre-Segregation Health Assessment because Mr. Pritt made suicidal statements. Dkt. 96-6 at 2 (¶ 4). Mr. Pritt told Nurse Roberts that he was not receiving his heart and psychiatric medications. Dkt. 114 at 8-9 (¶ 4). Nurse Roberts's assessment of Mr. Pritt was normal and there was no medical contraindication for segregation placement. Dkt. 96-6 at 2 (¶ 4). Mr. Pritt told her that he was feeling faint, chest pains, blurred vision, ringing in his ears, and he felt disoriented. Dkt. 114 at 8-9 (¶ 4). She told him to fill out a healthcare request. *Id.* Nurse Roberts had no other involvement with Mr. Pritt's medical care during this incarceration. Dkt. 96-6 at 2 (¶ 4).

### 3. July 16

On July 16, 2016, Nurse Clark attempted to read Mr. Pritt's PPD test. Dkt. 96-4 at 2 (¶ 4); dkt. 96-1 at 41. All inmates are given a PPD skin test when they enter the Jail, which helps determine risk of tuberculosis. Dkt. 96-4 at 2 (¶ 4). When Nurse Clark attempted to view Mr. Pritt's arm to see if his skin had reacted to the test, Nurse Clark documented that he refused to let her see his arm. *Id.* Mr. Pritt told her that he was not receiving his medications and that he was feeling

chest pain. Dkt. 114 at 10 (¶ 7). Nurse Clark had no other involvement with Mr. Pritt during this incarceration. Dkt. 96-4 at 2 (¶ 4).

Melissa Rigney, a mental health professional, met with Mr. Pritt for his initial suicide watch assessment. Dkt. 96-1 at 4 (¶ 10), 44-49. Mr. Pritt reported that he said he was suicidal to force them to give him some medication. *Id.* at 46. Ms. Rigney noted that Mr. Pritt was appropriate and coherent, and his thought process was intact. *Id.* Ms. Rigney noted that her plan was to follow up daily while Mr. Pritt remained on suicide precautions. *Id.*

### 4. July 17

On July 17, 2016, mental health professional Denise Davis met with Mr. Pritt for suicide watch daily follow-up. Dkt. 96-1 at 4 (¶ 10), 49-52. Mr. Pritt admitted to Ms. Davis that he only said he was suicidal in order to get his medications quicker and they discussed more appropriate ways for Mr. Pritt to get his needs met. *Id.* Ms. Davis noted that Mr. Pritt would remain on suicide watch until he received his mental health medication. *Id.*

### 5. July 18

On July 18, 2016, Ms. Davis saw Mr. Pritt for daily suicide watch follow-up and she noted that Mr. Pritt was waiting to see Dr. Gachaw, the psychiatrist, to determine whether he needed to be on Zoloft. *Id.* at 4 (¶ 10), 53-55.

### 6. July 19

On July 19, 2016, Ms. Andrews conducted the daily rounds of patients on suicide watch. *Id.* at 4 (¶ 10), 56-58. She stopped by Mr. Pritt's cell to meet with him while on suicide watch, but Mr. Pritt wasn't there because he was in court. *Id.* at 4 (¶ 10).

### 7. July 20

On July 20, 2016, Ms. Andrews again conducted suicide rounds and this time met with Mr. Pritt. *Id.* at 4 (¶ 11), 59-61. He reported that he should be receiving Zoloft. *Id.* at 4 (¶ 11), 59-61. Ms. Andrews asked him if he had any current thoughts of suicide and he refused to answer. *Id.* at 4 (¶ 11), 59-61. She therefore kept Mr. Pritt on suicide watch. *Id.* at 4 (¶ 11). He also told her that he was feeling ill, fatigued, and paranoid and that he was not getting his prescribed medications. Dkt. 114 at 13 (¶ 11). If a patient reports they were on medication at the facility they were transferred from, Ms. Andrews' normal procedure is to reach out to that facility for verification. Dkt. 96-1 at 4 (¶ 11).

### 8. July 21

On July 21, 2016, Ms. Andrews again conducted suicide rounds and attempted to engage Mr. Pritt in conversation, but he refused to speak to her. *Id.* at 4 (¶ 12), 63. Mr. Pritt states that he told her that he would not answer her questions until he received his medications. Dkt. 114 at 13-14 (¶ 12).

Nurse Wheatcraft-Hadley made a referral for Mr. Pritt to mental health staff. Dkt. 96-1 at 62; dkt. 96-2 at 2 (¶ 4). In her referral, she noted that Mr. Pritt stated that he was taking Zoloft at New Castle and that he had not had any Zoloft since he had been in the Jail. Dkt. 96-1 at 62; dkt. 96-2 at 2 (¶ 4). She noted that Mr. Pritt was currently housed in the suicide block. Dkt. 96-1 at 62; dkt. 96-2 at 2 (¶ 4). This was Nurse Wheatcraft-Hadley's only involvement with Mr. Pritt during this period of incarceration at the Jail. Dkt. 96-2 at 2-3 (¶ 7).

### 9. July 22

Ms. Andrews conducted suicide rounds on July 22, 2016. Dkt. 96-1 at 4 (¶ 13), 64. This time Mr. Pritt spoke with her and they discussed that he was transferring back to the Department

11

of Correction that day. *Id*. at 4 (¶ 13). Nurse Lauren Kannaple saw Mr. Pritt during nursing segregation rounds. *Id.* at 44. Mr. Pritt again asked for his medications. Dkt. 114 at 15 (¶ 14).

From July 13 through 22, 2016, the psychiatrist and/or psychiatric nurse practitioner did not prescribe Zoloft or any other mental health medication for Mr. Pritt. Dkt. 96-1 at 4 (¶ 14). Therefore, Dr. Gachaw and/or the psychiatric nurse practitioner would have needed to see Mr. Pritt for an appointment in order to prescribe the Zoloft. *Id*. That appointment did not occur before Mr. Pritt's return to the Department of Correction. *Id*.

Nurse Poland and Nurse Carter did not interact with Mr. Pritt during this period of time in the Jail. Dkt. 96-3 at 2 (¶ 5); dkt. 96-5 at 2 (¶ 5).

### D. Mr. Pritt's Time at the Jail between February 16-24, 2017

Mr. Pritt returned to the Jail from New Castle on February 16, 2017. Dkt. 96-5 at 2 (¶ 5).

#### 1. February 16

Nurse Carter conducted Mr. Pritt's intake screening. *Id*. (¶ 6); dkt. 96-1 at 65-70. Mr. Pritt claims he told Nurse Carter what medications he was taking, and that Nurse Carter looked at what the medications he brought with him. Dkt. 114 at 16 (¶ 2). Nurse Carter denies this occurred and claims Mr. Pritt denied that he was taking any medications. Dkt. 96-5 at 2 (¶ 6).  Nurse Carter referred Mr. Pritt to the medical provider for consideration of whether he needed medication and to mental health staff based on his answers to the mental health questions. Dkt. 96-5 at 2 (¶ 6).

Mr. Pritt did not have any paperwork from the Department of Correction him showing what medications he was on. *Id.* After conducting his intake screening, Nurse Carter placed Mr. Pritt in segregation per his request. Dkt. 96-5 at 3 (¶ 7); dkt. 96-1 at 5 (¶ 16), 72-74. Nurse Carter cleared Mr. Pritt for segregation by confirming there was no medical issue that prevented him from being in segregation. Dkt. 96-5 at 3 (¶ 7). Nurse Carter also ordered Mr. Pritt's PPD skin test for

tuberculosis. Dkt. 96-1 at 71. Mr. Pritt did not receive his medications that day. Dkt. 114 at 16 (¶ 2).

### 2. February 17

On February 17, 2017, Nurse Carter called Dr. Bryan Buller and reported the medical history that Mr. Pritt reported during intake and Dr. Buller prescribed the following medications: Coreg, Tamulosin, aspirin, Nitro, and Monoket. Dkt. 96-1 at 79-83; dkt. 96-5 at 3 (¶ 8). Nurse Carter had no further involvement in Mr. Pritt's care during this incarceration. Dkt. 96-5 at 3 (¶ 9).

Nurse Jamie Marble conducted Mr. Pritt's Pre-Segregation Health Assessment, noting that he reported suicidal thoughts but denied any plan and she referred him to mental health staff. Dkt. 96-1 at 76-78. Ms. Rigney assessed Mr. Pritt for his Suicide Watch Initial Assessment. *Id.* at 5 (¶ 16), 84-88. Mr. Pritt continued to claim suicidal thoughts, so he remained on suicide watch. *Id.*

During the 9:00 a.m. medication pass, a nurse with the initials DM passed Aspirin and Monoket to Mr. Pritt. *Id.* at 114-16. Mr. Pritt asked her why he did not receive Coreg and Zoloft and she told him those were all the orders he had. Dkt. 114 at 17 (¶ 3). During the 4:30 p.m. medication pass, Nurse Wheatcraft-Hadley administered Coreg to Mr. Pritt. Dkt. 96-2 at 2 (¶ 5). During the 9:00 p.m. medication pass, Nurse Robin Wheatcraft-Hadley administered Monoket to Mr. Pritt. *Id.* (¶ 6). Mr. Pritt informed her that he was not getting all of his medications or the correct doses. Dkt. 114 at 17 (¶ 3). He told her that he had not received, Zoloft, Flomax, and the rest of his Coreg. *Id.* He believed that the earlier dose of Coreg was short of a full dose. *Id.* A nurse with the initials DM also saw Mr. Pritt during nursing segregation rounds. Dkt. 96-1 at 75.

### 3. February 18

Ms. Andrews met with Mr. Pritt during suicide rounds on February 18, 2017. Dkt. 96-1 at 5 (¶ 17), 89-91. Mr. Pritt reported that he was supposed to be receiving Zoloft and he was not

getting it. Dkt. 96-1 at 5 (¶ 17), 89-91. Mr. Pritt appeared confused. Dkt. 96-1 at 5 (¶ 17), 89-91. If a patient reports they were on medication at the facility they were transferred from, Ms. Andrews's normal procedure is to reach out to that facility for verification. *Id.* at 5 (¶ 17).

During the 4:30 a.m. medication pass, Nurse Robin Wheatcraft-Hadley administered the following medication to Mr. Pritt: Coreg and Tamsulosin. Dkt. 96-2 at 2-3 (¶ 7). Mr. Pritt asked her why he was not receiving all of his medications. Dkt. 114 at 18 (¶ 4). During the 9:00 a.m. medication pass, a nurse with the initials DM administered aspirin and Monoket to Mr. Pritt. Dkt. 96-1 at 50-52. During the 4:30 p.m. medication pass, a nurse with the initials HJ passed Coreg to Mr. Pritt. *Id.* During the 9:00 p.m. medication pass, a nurse with the initials HJ passed Monoket to Mr. Pritt. *Id.* A nurse with the initials DM also saw Mr. Pritt during nursing segregation rounds. *Id.* at 75.

### 4. February 19

Ms. Andrews saw Mr. Pritt again on suicide rounds on February 19, 2017. Dkt. 96-1 at 5, (¶ 18), 93-94. He told her again that he was not receiving the correct medication. *Id.* He complained of chest pains and symptoms of paranoia and of PTSD/OCD. Dkt. 114 at 20 (¶ 5). A nurse with the initials DM also saw Mr. Pritt during nursing segregation rounds. Dkt. 96-1 at 76. During the 4:30 a.m. medication pass, a nurse with initials NM passed Coreg and Tamulosin to Mr. Pritt. *Id.* at 114-16. During the 9:00 a.m. medication pass, a nurse with initials DM passed aspirin and Monoket to Mr. Pritt. *Id.* During the 4:30 p.m. medication pass, a nurse with initials HJ passed Coreg to Mr. Pritt. *Id.* During the 9:00 p.m. medication pass, a nurse with initials HJ passed Monoket to Mr. Pritt. *Id.*

### 5. February 20

On February 20, 2017, during the 4:30 a.m. medication pass, Nurse Wheatcraft-Hadley administered Coreg and Tamsulosin to Mr. Pritt. Dkt. 96-2 at 2-3 (¶ 7); dkt. 96-1 at 114-16. He again complained that he was not getting the correct medications and was not receiving his Zoloft. Dkt. 114 at 21 (¶ 6). He also told her that he was experiencing chest pains and a cold and clammy feeling. *Id.* During the 9:00 a.m. medication pass, a nurse with initials KK passed aspirin and Monoket to Mr. Pritt. Dkt. 96-1 at 114-16. During the 4:30 p.m. medication pass, a nurse with initials AG passed Coreg to Mr. Pritt. *Id.* During the 9:00 p.m. medication pass, a nurse with initials AG passed Monoket to Mr. Pritt. *Id.* Mental health professional Courtney Cirotta had Mr. Pritt sign a Release of Information to New Castle so that Jail staff could obtain a list of Mr. Pritt's current medications and medical records. *Id.* at 5 (¶ 19), 95-96. Ms. Cirotta called the prison for a fax number of where to send the Release to and she was waiting on a call back. *Id.*

### 6. February 21

On February 21, 2017, Ms. Rigney followed up with Mr. Pritt on suicide watch. *Id.* at 6 (¶ 20), 97-99. He reported continued suicidal thoughts, and that he was paranoid and distrustful of everyone and having nightmares. *Id.* He told her that he had asked for his Zoloft but was not getting it and that he was experiencing extreme chest pain. Dkt. 114 at 22 (¶ 7). A nurse with the initials DM also saw Mr. Pritt during nursing segregation rounds. Dkt. 96-1 at 75. During the 4:30 a.m. medication pass, a nurse with initials TH passed Coreg and Tamulosin to Mr. Pritt. *Id.* at 114-16. During the 9:00 a.m. medication pass, a nurse with initials DM passed aspirin and Monoket to Mr. Pritt. *Id.* During the 4:30 p.m. medication pass, a nurse with initials HJ passed Coreg to Mr. Pritt. *Id.* During the 9:00 p.m. medication pass, a nurse with initials HJ passed Monoket to Mr. Pritt. *Id.*

### 7. February 22

Dr. Gachaw examined Mr. Pritt on February 22, 2017 and prescribed Zoloft. *Id.* at 6 (¶ 21), 103-04. Ms. Rigney also saw Mr. Pritt for daily suicide rounds. *Id.* at. 6 (¶ 22), 106-08. Mr. Pritt said he would be suicidal while he remained at the Jail. *Id.* A nurse with the initials DM also saw Mr. Pritt during nursing segregation rounds. *Id.* at 75. During the 4:30 a.m. medication pass, a nurse with initials NM passed Coreg and Tamulosin to Mr. Pritt. *Id.* at 114-16. During the 9:00 a.m. medication pass, a nurse with initials DM passed aspirin and Monoket to Mr. Pritt. *Id.* During the 4:30 p.m. medication pass, a nurse with initials MT passed Coreg to Mr. Pritt. *Id.* During the 9:00 p.m. medication pass, a nurse with initials MT passed Monoket to Mr. Pritt. *Id.*

### 8. February 23

Ms. Rigney saw Mr. Pritt on daily suicide rounds on February 23, 2017. *Id.* at 6 (¶ 22), 109-11. During the 4:30 a.m. medication pass, a nurse with initials JM passed Coreg and Tamulosin to Mr. Pritt. *Id.* at 114-16.  During the 9:00 a.m. medication pass, a nurse with initials DM passed aspirin, Monoket, and Zoloft to Mr. Pritt. *Id.* During the 4:30 p.m. medication pass, Nurse Robin Wheatcraft-Hadley administered Coreg to Mr. Pritt. Dkt. 96-2 at 2 (¶ 5). Mr. Pritt told her he was having chest pains and asked for nitroglycerin and Zoloft. Dkt. 114 at 24 (¶ 9). During the 9:00 p.m. medication pass, Nurse Wheatcraft-Hadley administered Monoket to Mr. Pritt. Dkt. 96-2 at 2 (¶ 6). A nurse with the initials DM also saw Mr. Pritt during nursing segregation rounds. Dkt. 96-1 at 75.

### 9. February 24

On February 24, 2017, during the 4:30 a.m. medication pass, a nurse with initials NM passed Coreg and Tamulosin to Mr. Pritt. Dkt. 96-1 at 114-16. During the 9:00 a.m. medication

pass, a nurse with initials DM passed aspirin, Monoket, and Zoloft to Mr. Pritt. *Id.* at 6 (¶ 23), 114-16. Mr. Pritt was then returned to New Castle. *Id.*

Nurses Poland, Clark, Hansen, and Roberts were not involved in Mr. Pritt's medical care during this time. Dkt. 96-3 at 2 (¶ 5); dkt. 96-4 at 2 (¶ 5); dkt. 96-7 at 2 (¶ 3); dkt. 96-6 at 2 (¶ 5).

### III. Discussion

The defendants seek summary judgment on Mr. Pritt's claims, arguing that they were not deliberately indifferent to his serious medical needs.

At all times relevant to Mr. Pritt's claims, he was a convicted inmate so his treatment and conditions of confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). To establish an Eighth Amendment claim for deliberate indifference to serious medical needs, "the plaintiff must prove that he suffered from '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016).

The defendants do not dispute for purposes of the motion for summary judgment that Mr. Pritt's need for his prescription medications was a serious medical need. Dkt. 96 at 19. They argue, however, that they were not subjectively deliberately indifferent to this need. *Id.* To show deliberate indifference, "a plaintiff does not need to show that the official intended harm or believed that harm would occur," but "showing mere negligence is not enough." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*). Instead, a plaintiff must "provide evidence that an

official *actually* knew of and disregarded a substantial risk of harm." *Id.* Mr. Pritt's claims against each defendant will be discussed separately.

### A. Megan Andrews

Ms. Andrews argues that she is entitled to summary judgment because she did not have the authority to prescribe or administer medication.  Dkt. 96 at 22. The decision to prescribe Mr. Pritt mental health medications in the Jail was solely up to the psychiatrist and the psychiatric nurse practitioner. *Id.* Ms. Andrews met with Mr. Pritt at the Jail during July 2016 and February 2017.

In July 2016, Ms. Andrews saw Mr. Pritt during her suicide watch rounds.  Dkt. 96-1 at 56-64. Mr. Pritt reported that he was not receiving his Zoloft and that he was not feeling well. *Id.* at 59-61; dkt 114 at 13 (¶ 11). Mr. Pritt was scheduled to see Dr. Gachaw, the psychiatrist. Dkt. 96-1 at 3-4 (¶ 10). Mr. Pritt was also being seen by nursing staff during this time period.

In February 2017, Ms. Andrews met with Mr. Pritt while he was on suicide watch and he informed her that he needed Zoloft. Pursuant to her usual procedure, Ms. Andrews then wanted to obtain Ms. Pritt's medication list from the prison. Dkt. 96-1 at 5 (¶ 18). Mental health staff had Mr. Pritt sign a Release on February 20, 2017, so they could obtain his medication list from the prison. *Id.* Two days later, Dr. Gachaw, the psychiatrist, examined Mr. Pritt and prescribed Zoloft for him and Mr. Pritt thereafter received Zoloft. *Id.* at 6 (¶ 21).

Ms. Andrews had no further personal involvement in passing or prescribing medication, or communicating to the Jail doctor regarding Mr. Pritt's physical medical needs.  She met with Mr. Pritt during his suicide watch rounds at the Jail. She responded to his concerns regarding his medications and mental health to the extent she could as a social worker when she took steps to verify his mental health medications and communicated with Dr. Gachaw to prescribe them. She had no ability or authority to take any action regarding his other medications. In addition, Mr. Pritt

was being seen by nurses and a psychiatrist during this time. No reasonable jury could conclude that Ms. Andrews was deliberately indifferent to Mr. Pritt's serious medical needs under these circumstances, so she is entitled to summary judgment.

**B. Nurses**

The nurses argue they are entitled to summary judgment because they cannot prescribe medication and treatment, and they administered all of Mr. Pritt's prescribed medications to him. Each nurse's interactions with Mr. Pritt is discussed separately.

**1. Nurse Carter**

Nurse Carter saw Mr. Pritt in December 2015 and February 2017.

In December 2015, Nurse Carter's only involvement with Mr. Pritt was to pass medications to him on two occasions. Dkt. 96-1 at 27-29. Mr. Pritt asserts that on December 15 he told Nurse Carter that he did not receive his Monoket or Zoloft. Dkt. 114 at 6 (¶ 4). He argues that Nurse Carter did nothing to help him.

A reasonable jury could find that Mr. Pritt told Nurse Carter he was not receiving all of his medications and that Nurse Carter ignored this complaint. A decision to ignore a request for medical assistance may constitute deliberate indifference. *Petties*, 836 F.3d at 729 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Nurse Carter is therefore not entitled to summary judgment.

**2. Nurse Clark**

In July of 2016, Nurse Clark attempted to read Mr. Pritt's PPD test to determine if he had been exposed to tuberculosis. Mr. Pritt told her that he was not receiving his medications and that he was feeling ill. Dkt. 114 at 10 (¶ 7). Viewing these facts in the light most favorable to Mr. Pritt, a reasonable jury could find that Mr. Pritt made these statements to Nurse Clark and that she ignored his complaints. Nurse Clark is therefore not entitled to summary judgment.

### 3. Nurse Clemons

In December 2015, Nurse Clemons saw Mr. Pritt only on his first day in the jail when she conducted his intake screening. She referred him to the medical provider for chronic care and to mental health staff for routine mental health problems. Dkt. 96-1 at 14. Nurse Clemons would not let Mr. Pritt keep his medications and told him that CCS policy prohibited inmates from having their medications. Dkt. 114 at 5 (¶ 2). Nurse Clemons noted that Mr. Pritt requested to go into segregation for self-protection and she conducted a Pre-Segregation Health Assessment and cleared him for segregation. Dkt. 96-1 at 16-18. She obtained orders from the doctor who prescribed Mr. Pritt medications. *Id.* at 22. She also obtained orders from the mental health nurse practitioner, who prescribed Zoloft. *Id.* at 21.

Nurse Clemons referred Mr. Pritt to the appropriate medical providers upon his intake into the Jail, who prescribed them medications. She did not interact with him at any other time. No reasonable jury could find that Nurse Clemons was deliberately indifferent to Mr. Pritt's serious medical needs, so she is entitled to summary judgment.

### 4. Nurse Hansen

Nurse Hansen interacted with Mr. Pritt on July 13, 2016, during his intake screening. Dkt. 96-7 at 2 (¶ 4). Mr. Pritt reported taking medications, including a blood pressure medication, aspirin, Flomax, and Zoloft. *Id.*; dkt 114 at 8 (¶ 2). Mr. Pritt brought his medications with him and told Nurse Hansen that he had done so, but she could not find them. Dkt. 114 at 8 (¶ 2). Mr. Pritt did not have any paperwork relating to his current medications. Dkt. 96-7 at 2 (¶ 4). Nurse Hansen's usual practice was to schedule the inmate to be seen in the Jail's chronic care clinic, so that the Jail's doctor or nurse practitioner could decide if the inmate needed medication. *Id.* Mr. Pritt was only in the Jail for another week, so he would not have had his chronic care clinic appointment

within that time frame. *Id*. Mr. Pritt asserts that without his medications, he suffered blurred vision, ringing in the ears, chest pain, difficulty urinating, confusion, headaches, among other symptoms. Dkt. 114 at 4 (¶ 14). Nurse Hansen referred Mr. Pritt to the mental health staff due to his reported mental health issues and because he reported taking medication that she could not verify. *Id*. The vital signs that Nurse Hansen took during Mr. Pritt's intake screening were normal. *Id.*

Based on these facts, when viewed in the light most favorable to Mr. Pritt, a reasonable jury could conclude that Nurse Hansen was deliberately indifferent to his medical needs. Mr. Pritt was on medication for his heart and mental health conditions and it is reasonable to infer that even a week's interruption in these medications could be dangerous and caused him to experience adverse physical symptoms. Nurse Hansen is therefore not entitled to summary judgment.

### 5. Nurse Poland

Nurse Poland saw Mr. Pritt during the 9:00 a.m. medication pass on December 16, 2015, and administered Colace, Coreg, aspirin, and Flomax to Mr. Pritt at that time. Dkt. 96-1 at 26-29. Nurse Poland did not administer Monoket at that time because it was not in stock. Dkt. 96-3 at 2 (¶ 3). Any time that Nurse Poland was passing medication and she discovered that a medication was not in stock, she followed up with her supervisor, either the director or nursing or the health services administrator, to confirm that the medication was being ordered from the pharmacy. *Id*. During this medication pass, Mr. Pritt did not have an active order for Zoloft. *Id.* (¶ 4). It appears that on that day, Dr. Gachaw discontinued the short-term order for Zoloft from the nurse practitioner and instead made a new long-term order for the medication. *Id.* However, that new order had not yet made it into the system when Nurse Poland did her medication pass, so it did not show as an active order. *Id.* Nurse Poland administered all of the medications for which Mr. Pritt had an active order. *Id*. Nurse Poland had no other involvement with Mr. Pritt's care. *Id.* (¶ 3).

In short, Nurse Poland administered the medications that were available and prescribed to Mr. Pritt. There is no evidence that she did not properly follow up regarding the lack of Monoket when it was not in stock. There is therefore no evidence that she deliberately disregarded any risk to Mr. Pritt. Nurse Poland is therefore entitled to summary judgment.

### 6. Nurse Kannaple

On December 17, 2015, during the 9:00 a.m. medication pass, Nurse Kannaple documented that Mr. Pritt refused certain medications. Dkt. 96-1 at 27-29. Mr. Pritt states that he asked Nurse Kannaple why he was still not receiving Zoloft. Dkt. 114 at 7 (¶ 6). He also states that he never refused or denied care. *Id.* (¶ 7). Nurse Kannaple also saw Mr. Pritt during nursing segregation rounds. Dkt. 96-1 at 43. Mr. Pritt again asked for his medications. Dkt. 114 at 15 (¶ 14). There is no evidence that she provided his medications or otherwise followed-up regarding his complaints that he was not receiving them.

Based on these facts, when viewed in the light most favorable to Mr. Pritt, a reasonable jury could conclude that Mr. Pritt asked for necessary medications and emergency care, but Nurse Kannaple ignored these requests. Nurse Kannaple is therefore not entitled to summary judgment.

### 7. Nurse Wheatcraft-Hadley

During the 9:00 p.m. medication pass on December 16, 2015, Nurse Wheatcraft-Hadley administered medications to Mr. Pritt. Dkt. 96-1 at 27-29. Mr. Pritt told Nurse Wheatcraft-Hadley that the was having chest pains, difficulty breathing, nausea, and pain and he asked for nitroglycerin. Dkt. 114 at 7 (¶ 5). She did not request urgent care for him or otherwise treat him. *Id.*

On February 20, 2017, during the 4:30 a.m. medication pass, Nurse Wheatcraft-Hadley administered medications to Mr. Pritt. Dkt. 96-2 at 2-3 (¶ 7); dkt. 96-1 at 114-16. He again

complained that he was not getting the correct medications and was not receiving his Zoloft. Dkt. 114 at 21 (¶ 6). He also told her that he was experiencing chest pains and a cold and clammy feeling. *Id.*

Based on these facts, when viewed in the light most favorable to Mr. Pritt, a reasonable jury could conclude that Nurse Wheatcraft-Hadley was deliberately indifferent to his serious medical needs. Mr. Pritt testified that on two occasions he told her he was experiencing chest pains, among other symptoms, and she did not treat him or refer him to a doctor. Nurse Wheatcraft-Hadley is therefore not entitled to summary judgment.

### 8. Nurse Roberts

On July 15, 2016, Mr. Pritt apparently made suicidal statements, so Nurse Roberts completed a Pre-Segregation Health Assessment. Dkt. 96-6 at 2 (¶ 4). Mr. Pritt told Nurse Roberts that he was not receiving his heart and psychiatric medications. Dkt. 114 at 8 (¶ 4). Nurse Roberts's assessment of Mr. Pritt was normal and there was no medical contraindication for segregation placement. Dkt. 96-6 at 2 (¶ 4). Nurse Roberts had no other involvement with Mr. Pritt's medical care. *Id.*

Based on these facts, when viewed in the light most favorable to Mr. Pritt, a reasonable jury could conclude that Mr. Pritt told Nurse Roberts that he was not receiving his heart medications and she ignored these complaints. Nurse Roberts is therefore not entitled to summary judgment.

### C. Correct Care Solutions

CCS also seeks summary judgment on Mr. Pritt's claims. Because CCS acts under color of state law by contracting to perform a government function, providing medical care to correctional

facilities, it is treated as a municipality for purposes of Section 1983 claims. *See Jackson v. Ill. Medi-Car, Inc.,* 300 F.3d 760, 766 (7th Cir. 2002).

A municipality cannot be held vicariously liable underSsection 1983 for the actions of its agents or employees. *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 35–36 (2010) (explaining *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978)). Rather, it can be liable only for its own actions and corresponding harm.  *Id.*  "The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one untaken by a subordinate actor?" *Glisson v. Ind. Dept. of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (*en banc*). An action is "one of the institution itself," *id.*, when the municipality's "official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind [the] constitutional injury," *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *Monell*, 436 U.S. at 658; *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)); *see Humphries*, 562 U.S. at 36 (reciting the "list of types of municipal action" that can lead to liability).

Further, "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986). A claim against a municipality (or its contractor) may stand on "a deliberate policy choice pursuant to which no one was responsible for coordinating [the patient's] overall care." *Glisson*, 849 F.3d at 375–76.

CCS seeks summary judgment arguing that Mr. Pritt can show no policy on its part that impacted the medications he was prescribed because the prescription of his medications was up to the discretion of the Jail doctor, psychiatrist, or nurse practitioner. Dkt. 96 at 32. According to CCS, this conclusion is supported by the fact that each time Mr. Pritt entered the Jail, his medications were handled differently. *Id.* at 33. Nurses Clemons and Carter referred his concerns

regarding his medications to a doctor, who prescribed medications to him, while Nurse Hansen scheduled him for a chronic care appointment that did not take place while he was in the Jail. *Id.* Further, CCS has presented evidence that there was no policy dictating what medications an inmate receives, and that such decisions were left to the discretion of the Jail doctor. Dkt. 96-5 at 3 (¶ 10). Mr. Pritt responds that when he entered the Jail on December 14, 2015, Nurse Clemons told him that CCS policy prohibited inmates from having the medications they bring with them. Dkt. 114 at 5 (¶ 2).

Based on the designated evidence, a reasonable jury could conclude that CCS's failure to enact a policy to ensure that inmates entering the Jail received necessary prescription medications caused some of Mr. Pritt's injuries. It is undisputed, for purposes of summary judgment, that Mr. Pritt arrived at the Jail each time with serious medical needs requiring medication. While it is disputed whether Mr. Pritt brought his medications with him each time he went to the Jail, it is undisputed that Mr. Pritt was not allowed to keep the medications that he brought with him. Mr. Pritt testified that he was told that this was a CCS policy and, each time he arrived at the Jail with medications, he was not allowed to keep or take those medications. It is further undisputed that there was no policy regarding what medications to provide to an inmate upon arrival.

A reasonable jury could conclude that CCS policy did not allow inmates arriving at the Jail to keep their medications but there was no policy to ensure that inmates received necessary prescription medications upon intake. A reasonable jury might also conclude that CCS knew that inmates like Mr. Pritt would arrive at the Jail with serious conditions requiring medication but made a deliberate choice to take no action to ensure that they would receive continuity of care and needed medications for these conditions. *See Glisson*, 849 F.3d at 381 (discussing instances in which liability can be based on the failure to make a policy). While a jury could reach the opposite

25

conclusions, either requires making credibility determinations and resolving contested factual issues, functions that are reserved for a jury. *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

CCS, therefore, is not entitled to summary judgment on Mr. Pritt's policy claim.

### D. Claims that are not proceeding

In his response to the motion for summary judgment, Mr. Pritt presents several arguments related to claims that are not proceeding in this case. Specifically, he references incidents that took place after February 2017—the last incident described in the complaint—and after he filed his complaint on August 7, 2017. He also raises allegations against Jennifer Eidson and other nurses who are not defendants. In addition, Mr. Pritt states allegations against Marion County Sheriff John Layton, the Marion County Jail, the Marion County Sheriff's Office, and individual sheriff deputies, none of whom are defendants. Finally, he makes claims regarding the conditions of his cell and treatment he requested for an alleged assault and insect bites he experienced in July of 2016.

The defendants object to the presentation of any claims based on these allegations, arguing that such allegations are not part of his complaint and therefore are not part of the claims in this case. In his surreply, Mr. Pritt argues that he should be permitted to pursue these claims because he repeatedly indicated his intention to amend his complaint. He contends that he should be allowed to pursue discovery to learn the names of John or Jane Doe defendants and that he should be permitted to pursue claims that he has specifically explained that he wants to add. He also states that he is not attempting to bring defendant Eidson back into the case.

The arguments Mr. Pritt makes in his response and surreply related to claims that are not proceeding in this case are understood to be a request for leave to file an amended complaint. This

request is denied because it is was submitted in response to the motion for summary judgment and not filed as a separate motion as required by Local Rule 7-1(a).

Moreover, his request for leave to amend is not supported by good cause. "Federal Rule of Civil Procedure 15 provides that, as a general rule, a court 'should freely give leave [to amend] when justice so requires.'" *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015) (quoting Fed. R. Civ. P. 15(a)(2)). But when, as here, a plaintiff moves to amend his complaint after the deadline set by the Court, the Court applies the "heightened good-cause standard of Rule 16(b)(4) before considering whether the requirements of Rule 15(a)(2) were satisfied." *Adams v. City of Indianapolis*, 742 F.3d 720, 734 (7th Cir. 2014). "In making a Rule 16(b) good-cause determination, the primary consideration for district courts is the diligence of the party seeking amendment." *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011).

The Court's Screening Order of January 9, 2018 specifically described the claims that were proceeding in this case and those that were dismissed. Dkt. 15. Then, in the Entry Setting Pretrial Schedule, the Court set a deadline of May 24, 2018, to file a motion to amend the complaint. Dkt. 45. Mr. Pritt's attempt to amend his claims in his response to the motion for summary judgment filed on October 8, 2019, is well beyond this deadline. While Mr. Pritt contends that he indicated his intention to move to amend and required additional discovery to allow him to identify additional claims, he was granted several extensions of time to complete discovery. Dkt. 76 (extending discovery deadline to February 25, 2019); dkt. 80 (directing defendants to provide plaintiff's medical records to him); dkt. 88 (extending discovery deadline to July 12, 2019). Mr. Pritt filed his latest motion for an extension of time to complete discovery well after the previous July 12 deadline and after the defendants filed their motion for summary judgment. *See* dkt. 99. Moreover, Mr. Pritt certainly knew he had claims regarding the conditions of his cell and the

alleged insect bites when he filed this case. He therefore could have presented those claims when he filed his complaint or sought leave to amend to add those claims in a timely manner. In addition, to the extent that Mr. Pritt required additional discovery to identify claims and defendants, he was given ample time to complete this discovery yet did not file a motion for leave to amend or a motion for an extension of time to seek leave to amend. Instead, he simply added new claims in his response to the motion for summary judgment. In these circumstances, he has not demonstrated sufficient diligence to support amendment of the complaint at this late stage. He therefore is not permitted to pursue any claims that were not identified in the screening order of January 9, 2018, dkt. 15.

## IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment, dkt. [95], is **GRANTED in part and DENIED in part**.

The motion is **GRANTED** as to Ms. Andrews, Nurse Clemons, and Nurse Poland. The claims against these defendants are dismissed and the **clerk shall terminate** these defendants on the docket.

The motion is **DENIED** as to Nurse Carter, Nurse Clark, Nurse Hansen, Nurse Kannaple, Nurse Roberts, Nurse Wheatcraft-Hadley, and CCS. Mr. Pritt's claims that these defendants violated his Eighth Amendment rights while he was in the Jail between December 10-17, 2015; July 12-21, 2016; and February 17-21, 2017, **shall continue to proceed** in this case.

Because the Court considered the arguments in Mr. Pritt's surreply as it deemed appropriate, the motion to strike the surreply, dkt. [120], is **DENIED** and the motion for leave to file surreply, dkt. [121], is **GRANTED**.

The Court will direct further proceedings, including a settlement conference and trial if necessary, through a separate order. If Mr. Pritt wants the Court to recruit counsel to represent him, he should file a motion on the Court's form. The **clerk shall** include a form motion for assistance with recruiting counsel with his copy of this Order.

No partial final judgment shall issue at this time.

**SO ORDERED.**

Date: 6/1/2020

*James Patrick Hanlon*

Distribution:

STEVEN W. PRITT
196024
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

All Electronically Registered Counsel

James Patrick Hanlon
United States District Judge
Southern District of Indiana

29